STATE OF MINNESOTA v. FRANK FLOYD and Another.[1]

June 27, 1895.

Nos. 9480—(75).

**New Trial—Sufficiency of Evidence.**

*Held*, on the evidence in this case, that the question of the guilt or innocence of the defendants was for the jury, and that it supported a verdict of guilty.

**Same—Misconduct of Prosecuting Attorney and Jurors.**

*Held*, also, that the affidavits presented by the defense and the prosecution, on the motion for a new trial, as to alleged misconduct on the part of the prosecuting officer when making his opening address to the jury, and as to alleged irregularities and misconduct of certain jurors during the trial, raised questions of fact for the determination of the court below, and also that there is no legal ground upon which this court can ignore and reverse the disposition of these questions in favor of the state.

**Same—Misconduct of Jurors.**

*Held*, further, that the trial court was fully justified in calling the attention of the jury to certain rumors affecting the conduct of one of their

[1] Reported in 63 N. W. 1096.

number, and in admonishing them as to a repetition of alleged miscon-
duct. If the rumors in question were of so serious a character as to
require a dismissal of the jury in question, and the impaneling of another
to try defendants, it was incumbent on their counsel to move in the mat-
ter upon being informed of the prevalence of such rumors. They could
not speculate upon the result by sitting silently by, with full knowledge
of the situation.

Appeal by defendants from an order of the district court for Hen-
nepin county, Jamison, J., denying a motion for a new trial. Af-
firmed.

*F. D. Larrabee*, for appellants.

*H. W. Childs*, Attorney General, and *George B. Edgerton*, for re-
spondent.

COLLINS, J. The defendants stand convicted of the offense of
grand larceny in the first degree. On appeal it is contended by
their counsel that the verdict of guilty was vitiated by certain al-
leged irregularities and misconduct during the trial on the part of
the prosecuting attorney and on the part of some of the jurors, and
also that the court erred when making a statement to the jury
relative to current rumors as to misconduct, and in not discharging
the jurors when informed of these rumors. It is also insisted with
great zeal by the counsel that the verdict is wholly without evi-
dence to support it. Naturally, we take up their last contention
at the outset.

One Scheig occupied the position of teller in a Minneapolis bank
for about six years immediately before his flight from the city, Sep-
tember 2, 1893. During these six years Scheig stole over $100,000
from the bank. He was indicted, arrested in England in company
with defendant Frank Floyd, brought back to Minneapolis, and,
on being arraigned, entered a plea of guilty of the offense as charged
in the indictment. Then followed the indictment, trial, and con-
viction of these defendants. There was no claim that either of
the Floyds had personally taken any of the money from the bank,
but it was charged in the indictment, and was the theory of the
prosecution at the trial, that they had aided, abetted, procured,
and influenced Scheig in the commission of the crime. He was
the principal witness for the state, and, unquestionably, his testi-

mony was potent in bringing about a verdict of guilty. We will state as concisely as possible the main features of that part of Scheig's testimony which particularly affected these defendants.

Scheig became intimately acquainted with the Floyd brothers about the year 1887. The three were of about the same age, unmarried, and with considerable leisure on their hands. Scheig was at work in the bank, but the Floyds had very little in the way of business or employment, and evidently they were practically without means. Until Scheig married, in the year 1892, these young men were together afternoons and evenings almost constantly, and three or four all-night carousals each week were not uncommon. The Floyds habitually borrowed money from Scheig, so that by the end of the year 1888 they had borrowed about $3,000. Occasionally small sums would be repaid, but, if Scheig is to be believed, the two Floyds and their mother really lived upon him. Their practice was, when they needed money, to go to the bank, and make out and present checks to Scheig, as teller. He would cash them, and afterwards return them to the Floyds. He also paid hotel and other bills for them, and at different times sent funds by express to them, in the South and East. It was Scheig's belief that he had in this way paid over to the defendants at least $20,000, and he claimed that they knew perfectly well that he was taking the money from the bank.

As early as 1889 Louis Floyd demanded a loan from Scheig at the bank, and, on being told that the latter did not have the money, said, "Well you have got it in your hands, and can get it when you want it." The amount demanded was paid over. At a later period Louis was refused money, and threatened to "go to the cashier of the bank, and inform" upon Scheig, unless his demands were acceded to. At another time, when Louis was about to be absent for awhile, he insisted that Scheig should make regular monthly payments to Mrs. Floyd, his mother, for her support. Scheig answered that he did not have the money to pay over, and, if paid, he "would have to get it from the bank." Over $500 was paid to Mrs. Floyd after this interview.

Of course, we have undertaken to state only a small fraction of the acts and the conversations of these three persons, but, if Scheig did not falsify when testifying, the Floyds drew money from him

at will for several years, and the circumstances and the conversations indicate quite clearly that they knew from whom, and how, he obtained it. They knew of his misdeeds, and used their knowledge to extract money for their own use, well aware that, in order to comply with their demands, Scheig would have to rob his employer still further.

In February, 1893, Scheig began to feel that disclosure of affairs at the bank was imminent, and that he would soon have to abscond to escape arrest. Louis Floyd was then absent from the city, but Frank was informed by Scheig of the dangerous situation. After several conversations and much planning between the two, it was agreed that Frank should be supplied with money by Scheig; should go to the vicinity of St. Louis, Missouri, and there prepare for a trip to be made by team through the South or East, when the time came for Scheig to fly from the scene of his criminal operations. Scheig testified that during these conversations he told Frank that the money to be used in making preparations and in traveling was to be taken from the bank, and that he (Scheig) also intended to sell a valuable library and some other goods before leaving, whereupon Floyd cautioned him about making such sales, for fear that it might come to the knowledge of the bank officials, and render them suspicious.

Frank Floyd left in March, but, before going, to facilitate correspondence between them, he rented lock box 33 at the Minneapolis post office for E. W. Phillips, giving Scheig the key. Going to St. Louis, Floyd began to make preparations for the departure of Scheig and himself, keeping the latter advised—by letters addressed to "Phillips, lock box 33, Minneapolis"—of what he was doing. He went under an assumed name, and when writing to Scheig sometimes addressed the letters to "E. W. Phillips," sometimes to "N. R. Thompson." The preparations in the way of horses, wagons, tents, supplies, and camping outfit were elaborate and expensive, requiring the expenditure of quite a large sum of money; and according to Scheig's narrative he sent over $4,000, stolen from the bank, to Frank Floyd during the summer. All was sent by express, usually placed inside the covers of books, in sums ranging from $200 to $400, addressed to "N. R. Thompson, Belvidere Hotel, St. Louis."

Louis Floyd returned to Minneapolis in the month of August, and

immediately informed Scheig that he knew where Frank was, what was intended, why Scheig had to leave, that he (Louis) was better fitted to manage an affair of that character than was his brother, and that he must be taken along. Money was furnished by Scheig, and Louis Floyd joined his brother in the month of August. Although the Floyds kept their headquarters in the city of St. Louis, the camp, in charge of a servant, was established a few miles out, near an obscure railway station in the state of Illinois.

On September 2 Scheig completed his looting of the bank by taking $12,000 in cash. That night he took his wife and went to Chicago, ostensibly to visit the World's Fair. The next night, pretending to his wife that business required him to return, and that he was going to Minneapolis, he left for St. Louis, and was there met by one of the Floyds. That afternoon they went to the camp, and that evening, under assumed names, Scheig, the two Floyds, and the servant started off on a trip which in time brought them to Nashville, Tennessee, Atlanta, Charleston, and finally to New York City, arriving there about the last of October. Of the money taken by Scheig, he deposited $4,000 in a St. Louis bank before leaving that city, and kept the balance with him.

It is unnecessary to particularize about the overland journey made by these persons. Part of the time the horses were driven, usually at night, the party camping during the day. At times the outfit would be loaded upon a freight car, and long distances made by rail. Money was spent lavishly, and when Scheig and the Floyds arrived in New York the former had but a few hundred dollars, aside from the certificates of deposit issued at St. Louis in the name of "N. R. Thompson," in his possession. The three men then secured passage upon a Brazilian steamer, which put to sea, but, meeting with an accident to her machinery, was compelled to return to port within 24 hours. When traveling by rail, and when securing passage on this steamer, Louis Floyd was the active manager, and was known as "Marston." His brother assumed the name of "Powell," and Scheig was called "J. H. Mansfield." From the time they left St. Louis they pretended that they were the sons of wealthy men residing at or near Pittsburgh, Pennsylvania. When the disabled steamer returned to its pier for repairs the Floyds went up into the city, and then learned from a newspaper that the authorities were in close pursuit of Scheig and one of

the Floyds. They returned and consulted with the former, finally deciding that he and Frank should take a steamship sailing for Europe next day, while Louis should go direct to Brazil, there to be joined by the other two as soon as possible. Louis then went to the steamship office, purchased two tickets for the steerage, and Scheig and Frank, again changing their names, took passage for England. A few days afterwards Louis was arrested on the Brazilian steamer, and on the arrival of Scheig and Frank at Southampton, England, they were taken into custody. It was shown that, when taken before a magistrate in London, both acknowledged their guilt, although not much importance can be attached to this fact, for, unquestionably, both were anxious to return to America without formality or delay.

We have thus stated the salient features of Scheig's testimony. To his version of the connection which the Floyds had with his criminal acts, there were added other facts and circumstances tending to show, as claimed by the prosecution, that the Floyds well knew for many years that Scheig was plundering the bank, and that they aided, abetted, and assisted in various ways, and that the proceeds of his crime were shared with them. Into these corroborative matters it is unnecessary to go. Of course, the Floyds, although obliged to admit much that was testified to by Scheig, and had been otherwise shown by the prosecution, positively denied that they knew or had reason to suspect Scheig's criminality, but their denials evidently had little weight with the jury. From what we have stated, it is obvious that there was evidence produced upon the trial which, if believed by the jury, established the defendants' guilt beyond a reasonable doubt. After a careful examination of the testimony relied upon by the state, we do not hesitate to say that, had the verdict been of acquittal, it could have been accounted for only on the hypothesis that the jury determined that Scheig willfully and repeatedly falsified when testifying, and, further, that by means of several inherently improbable explanations of their motives and conduct the defendants had swept away a large number of incriminating acts and circumstances closely connecting them with Scheig's depredations.

Before leaving this branch of the case, we wish to refer to a portion of Scheig's testimony which has been quoted by counsel for defendants, and relied upon as showing, beyond all manner of

doubt, that their clients were innocent of all knowledge of Scheig's bad conduct, and were not complicated in his thefts. When the Floyds discovered from the New York newspaper that the authorities were in close pursuit, they returned to the steamship, and there talked with Scheig, informing him of the danger. Louis then proposed that Scheig should go away to Europe, "as the detectives would be up with the party in a few days."

Then followed, on the cross-examination of Scheig, these questions and answers:

"Q. That 'they would be up with us in a few days,' and that it was best for you to get away! Why should you go away?

"A. Because they were after me.

"Q. What were they after you for?

"A. Because I had robbed the Bank of Minneapolis.

"Q. Hadn't he? [meaning Louis.]

"A. No, sir; I took the money from the bank.

"Q. Hadn't he helped you take it,—advised you to take it?

"A. Nobody knew anything about that.

"Q. Didn't he tell you to take the money from the bank?

"A. Nobody knew anything about that."

After one or two unimportant questions and answers, this subject was again brought up, thus:

"Q. Lou was the man, wasn't he? He was just as guilty as you were, if he advised you to go and take the money?

"A. Nobody knew it but the three of us, or the four, probably.

"Q. He thought that you ought to get out of the way?

"A. Yes, sir.

"Q. He thought there was no occasion for his getting out of the way?

"A. No, sir; he thought they would not connect him with it."

In this cross-examination there was not a word which weakened, or tended to change or modify, the witness' testimony previously given as to the knowledge and participation of the Floyds. The witness did not include them when asserting that "nobody knew anything about" it, nor could such construction be given his language. What he said, and what he was understood to say, was that no one but the participants themselves knew of the connection and complicity of the Floyds with the thefts personally committed

by Scheig, and hence the former had no reason to anticipate trouble. or to flee from officers in pursuit of the latter.

On the motion for a new trial the defendants' counsel presented affidavits as to the misconduct of the prosecuting officer when opening his case to the jury, and also as to misconduct of some of the jurors while the trial was in progress. It was charged that the attorney stated to the jury that he would show that Frank Floyd confessed his guilt, while returning from Europe, to one of the officers having him in custody, and that not only did he fail to show such a confession, but that he made no effort to do so. Respecting the jurors, it was claimed that they repeatedly, at their boarding places, at their homes, and even on the street, permitted people to talk to them about the case, and to talk about and discuss it in their presence. But, conceding that the contents of these moving affidavits tended to show misconduct, they were met, contradicted, and rebutted, in the opinion of the trial court, by those introduced in opposition by the state. By these moving and opposing affidavits, it is clear that questions of fact were presented for determination by the court below, which have been disposed of in favor of the state, and there is no legal ground upon which we can ignore and reverse the court's findings.

We fully recognize the doctrine contended for,—that cases must be tried in court, upon sworn testimony, and that no communications to jurors, outside of the court room can be tolerated. We shall not hesitate to enforce this doctrine, when convinced that the rule has been disregarded. In this connection, we remark that this was an important case, and had attracted attention throughout the entire country. That it excited great local interest is and was well known by court, counsel, and the defendants themselves, and it was the best judgment of the learned trial judge that the jurors should be kept together while the cause was being tried. Undoubtedly, this would have been done, had not defendants' counsel insisted that it was unnecessary. Of course, this statement is not made as a reason why the application for a new trial on the ground of misconduct of the jurors should be rejected, but simply in justice to the presiding judge.

During the trial, after clearing the room of spectators, the court stated to the jury, in substance, that within a day or two rumors

had reached him, which, if true, showed bad conduct on the part of one of their number. "Those rumors," said the court, "at the proper time, will be most thoroughly investigated, and the law will then be applied. But I want to say to you now, as I have said to you before, that nothing whatsoever is to be said by any one of you, and you are not to hear anything said about this case. You are not to discuss it among yourselves, until you reach the jury room." It is claimed that these remarks were error on the part of the court, and also that the court again erred in not promptly dismissing the jury when these rumors were heard. Defendants' counsel took no exceptions to the remarks, and apparently acquiesced in them. Nor did the counsel even suggest that the jury should be dismissed.

Without intimating that, in order to have the benefit of the alleged errors, it was incumbent upon counsel to except to what had been said by the court, and to take some action looking towards the discharge of the jury, when informed of misconduct and misbehavior, we have no hesitation in saying that the action of the court in calling attention to the reports, and in emphatically admonishing the jurors of their sworn duty, was perfectly justifiable and proper. Improprieties and irregularities on the part of jurors may be summarily checked by the use of language which is positive, so long as it is courteous and impartial. There was nothing said by the court which was not fully warranted, and not a word which could, by any possibility, have injured the defendants, or induced a conviction. If the rumors were of such a nature, and the occasion so momentous, as to require a dismissal of that jury, and the impaneling of another, defendants' counsel should have said so. They could not sit by, without remonstrance or affirmative action, and take the chances on securing an acquittal, reserving at the same time a complete right to move for and obtain a new trial, should a verdict of guilty be rendered.

This disposes of all points made by counsel which need discussion.

Order affirmed.