# STATE v. HARRY G. PLIAM.

77 N. W. (2d) 546.

June 8, 1956—No. 36,685.

*H. L. Nehls, Jr.,* and *Nehls, Anderson & Zimpfer,* for appellant.

*George M. Scott,* County Attorney, and *Douglas X. Juneau,* Assistant County Attorney, for respondent.

KNUTSON, JUSTICE.

This is an appeal from an order denying defendant's motion for judgment notwithstanding the verdict or a new trial in a proceeding to determine paternity.

The sole question for our determination is whether the credible evidence supports the verdict.

Complainant, a single woman 24 years of age at the time of trial, was born at Alexandria, Minnesota, where she completed high school. She came to Minneapolis about six years before the trial and worked in various retail establishments. She lived with a sister in a club maintained for girls. She first met defendant on February 20 or 21, 1953. Her name and telephone number had been given to him by

a friend, and he called her on the telephone and arranged to take her out. During the evening they had dinner and some drinks, and at about 11 o'clock they returned to defendant's apartment. It is undisputed that on that occasion she spent all night with defendant. She claims that they had intercourse on this first occasion. She contends that they saw each other frequently during the months of March and April; that she stayed with him all night on several occasions, both in his apartment and at his lake home on Lake Minnetonka; and that they had intercourse on several of these occasions.

Defendant was 54 years of age at the time of trial. He lives in an apartment and also owns a summer home at Lake Minnetonka. He was divorced some years ago. He admits that he first met complainant on February 20 or 21 and that she slept with him that night completely disrobed. He denies any completed act of intercourse. He admits seeing her on four or five occasions during the months of March and April but denies having had any intercourse with her.

■ There is much to be desired in the trial of this case on the part of both the state and the defendant. We are confronted with charges and denials that are not unusual in this type of case. That one party or the other is not telling the truth is obvious. It is possible that both parties, to some extent at least, had a tendency to shade the complete truth. While it is conceded that conception could not have occurred from any act which took place on the occasion of the first meeting of the parties in February, defendant's admission that he took complainant to his apartment and that she spent the entire night with him in his bed, completely disrobed, the first time he met her must have reached the ears of the jury with a devastating impact. No doubt the state could sense the effect of such admission, which may account for the unsatisfactory state of the record.

Complainant was thoroughly examined and cross-examined. Her testimony leaves much to be desired. Throughout the trial a small calendar was used to bolster her memory as to the dates on which she claims various acts between complainant and defendant occurred. She first claimed to have made notations concerning dates on which

she was out with defendant on this calendar as they occurred. Her original testimony was:

"Q. * * * Do you have some way or means of remembering those times and dates, * * *? Do you have some way of remembering?

"A. Yes. I jotted down a few of the dates on a calendar which you now have.

"Q. Yes, and that calendar is something that you had in your place of residence at the time you were going out with Mr. Pliam?

"A. Yes, it was.

"Q. And from time to time did you make marks on this calendar?

"A. Yes, I did.

*     *     *     *     *

"Q. And were the marks made on there made at or about the time of the incidents that are marked on there?

"A. Well, I jotted these things down on here after the incidents had happened.

"Q. And when did you do that?

"A. After the incidents had happened, Mr.——

"Q. Yes, and since that time have you changed or altered any of the marks on the calendar?

"A. No."

It appeared from the calendar that she had first met defendant on March 20. When she was confronted with that fact, she changed her original testimony and stated that it was on March 20 or 21 that they had first met. Her testimony in that respect was as follows:

"Q. What happened on March 20th?

"A. Friday, March 20th, was when I first met him, I have here on this calendar.

"Q. That's what you have got on the calendar?

"A. Yes.

"Q. But your testimony is that you met him on February 19th or 20th?

"A. The correct date is March 20th.

"Q. Well, do you want us to believe now that you didn't meet him in February?

"A. It says here March 20th is where I met him on a blind date.

\* \* \* \* \*

"Q. Well, your testimony has been, both on direct and on cross-examination, and you have gone into detail on it, that you met him in February of 1953?

"A. I also mentioned to you that I filled these dates in on the calendar after these things had happened.

"Q. Well, I remember that. All right. Isn't it true, now, that you met him in February of 1953, or do you want to change your testimony?

"A. I want to change my testimony to March.

"Q. Then all of this that we have gone through here for the last half hour about February—

"A. Was time wasted."

After recess and a conference with the welfare worker who was present in court in charge of her case, she again went back to February 20 as the date of the first meeting. She then said:

"Q. Do I understand you want to change your testimony again?

"A. Yes, because you got me nervous and confused for a little while, so I would like to stick to the first dates.

"Q. In February?

"A. Yes."

After a great deal of examination and cross-examination, she admitted that she made up the entire calendar in May after she learned that she was pregnant. Her testimony in that respect is:

"Q. Did you put them all on at one time?

"A. Yes, I did. I put them on right after I became pregnant. That was in the month of May I put them on there.

\* \* \* \* \*

"Q. What did you do, go get this calendar—

"A. Yes, I got this calendar.

"Q. —and then did you take and make these markings on there?

"A. Yes, that's right.

"Q. In other words, you didn't keep an accurate diary of affairs, of these incidents that occurred from time to time with—

"A. Ah—no, I didn't. I remembered, of course what we did.

\* \* \* \* \*

"Q. Now, just tell us when did you actually make up Plaintiff's Exhibit A?

"A. In the month of May, the last part of May.

\* \* \* \* \*

"Q. You wanted this so that you could use it in court?

"A. Yes, I wanted to use it later on in court."

It is apparent that exhibit A was made for the purpose of using it in court.

There are other portions of complainant's testimony that are entirely incredible. She testified that she was at defendant's lake home in the month of February and that ice then was breaking up. She said that she saw water standing around the edge of the lake. Weather reports introduced in evidence showed a low on that date of 9 degrees above zero.

Exhibit A was examined by a handwriting expert selected by the county attorney at the request of defendant. Among other things he found on it a pencil notation on April 24 which he deciphered as reading: "Fell for Byron." Confronted with this testimony, complainant testified that the notation read: "Fur—Bjorkman's the 24th." She said that on that date she drove into town with defendant, having spent the 23rd with him; that he had taken a fur cape to Bjorkman's for storage; and that she had made a notation of it on her calendar. She admitted that this was the only notation made in pencil and that it was the only notation made at the time the incident occurred. The handwriting expert testified that an attempt had been made to erase this pencil notation. From an examination of exhibit A it is difficult to say who was right. That there has been an attempt to erase the entry is reasonably clear. This bit of evidence was quite crucial and could, in a manner, have determined who was telling the truth. It might be argued that complainant was

confused as to dates, but she could not have been confused on this item. Either she was telling the truth or was deliberately lying on this item. If she was lying, it would indicate that she may have been intimate with other men. We assume that, if a fur cape had been stored by defendant at Bjorkman's store on that date, there would be a record of it in the store. Why it was not followed up to either prove or disprove the truth of complainant's claim is hard to understand.

Another bit of evidence which might have shed some light on the truth of complainant's assertion arose with respect to her claim that on April 13, a crucial time in this case, defendant burned himself with a sun lamp and that she was in his apartment on that date. Her testimony is:

"Q. What happened at that time?

"A. Ah—he had burned his back at that time and he asked me if I would use olive oil to rub his back for him, so I did that and I spent that evening with Mr. Pliam that evening, and Mr. Pliam was a little careless that evening during sexual intercourse."

On cross-examination she admitted that she had made no notation on exhibit A showing this occurrence, but she said: "And I know two girls who know that." No attempt was made to follow this matter up or to find out who the two girls were or to call them to corroborate the testimony of complainant.

There are many other discrepancies. Complainant testified that she and defendant and two friends had dinner at his lake home in February. Defendant denies this. Neither party attempted to call the two friends.

In an attempt to corroborate complainant's testimony that the parties had spent some time at defendant's lake home in late February and early March, the state called a sister of complainant. She testified that she had talked to defendant on the telephone from his lake place both in late February and early March. The evidence is conclusive that defendant's telephone at the lake was disconnected in October of the previous year and was not again

connected until April 3. The testimony of complainant's sister is equally as unsatisfactory as that of complainant herself.

Ordinarily in a case of this kind we would not reverse the verdict of a jury based on conflicting evidence. Where, however, the verdict rests on the uncorroborated testimony of the complainant and that testimony is as unsatisfactory as in this case, it should be incumbent on the state to call witnesses who can either corroborate or refute the testimony of one party or the other, where they are available. Here there were several witnesses who could have been called. Apparently the state was content to rest on the assumption that the jury probably would convict and to make no effort to produce the evidence which might have determined where the truth lay. Under these circumstances, we reluctantly conclude that there should be a new trial in the interests of justice.

■ One other matter requires some comment. In connection with this motion for a new trial, defendant submitted his affidavit setting forth certain alleged acts of misconduct on the part of the jury. In his affidavit he stated that he had been advised by the assistant county attorney, who prosecuted the action, that during the trial of the case two of the women jurors sitting in the case were discussing the action during the progress of the trial and that one of them was heard to say to the other that she felt sorry for the complaining witness. We find no denial of this charge by the assistant county attorney, so we assume that it is true. The statement of itself would be of little consequence. The affidavit does contain a statement, however, which, if true, might have furnished some grounds for a new trial if adequate action had been taken to protect the record. Defendant states that during a recess of the trial he saw one of the women jurors sitting with the complaining witness, her sister, and a member of the county welfare department who was instrumental in the prosecution of the action; that the juror was seen having a conversation with these people; that he watched them for some five minutes; that as he left the welfare worker noticed him and pointed in his direction; and that he thereupon went to call his counsel and one of the court officials but that when he returned

with them the juror had retired to the jury box. He further states that the episode was called to the attention of the court immediately and that it was admitted by the welfare worker.

The record does not show what transpired thereafter. No motion for a mistrial was made, nor, as far as appears from the record, did defendant or his attorney ask for any cautionary instructions. If defendant at that time thought that the incident deprived him of a fair trial, it was his duty to act promptly. A party ordinarily is not entitled to sit idly by and speculate on the outcome of a trial and then urge such alleged acts of misconduct as grounds for a new trial after an unfavorable verdict.[1]

While we do not consider the record sufficient to warrant a new trial for such misconduct, neither do we condone the conduct of a member of the welfare board in talking to members of the jury during the course of the trial. In cases of this kind, members of the welfare board have an interest in the outcome of the case quite aside from that of a spectator. Even if conversations with jurors have nothing to do with the trial, it cannot help but arouse a suspicion that an attempt is being made to gain the sympathy of the jury on behalf of the complainant. Members of a board of welfare, acting as public servants, should hold themselves above any possibility of arousing such suspicion.

In view of the unsatisfactory condition of the record, we conclude that in the interests of justice there should be a new trial.

Reversed.

[1]State v. Remen, 160 Minn. 527, 200 N. W. 803; State v. Salverson, 87 Minn. 40, 91 N. W. 1; State v. Floyd, 61 Minn. 467, 63 N. W. 1096.